David L. NORVELL, Attorney General of the State of New Mexico, Plaintiff,

Board of Commissioners of Santa Fe County, Plaintiff-Intervenor,

v.

SANGRE de CRISTO DEVELOPMENT COMPANY, INC., a New Mexico corporation, et al., Defendants,

Mescalero Apache Tribe, Defendant-Intervenor.

Civ. No. 9106.

United States District Court, D. New Mexico.

Feb. 20, 1974.

Paul L. Bloom, Special Asst. Atty. Gen., Santa Fe, N. M. (David L. Norvell, Atty. Gen.), for plaintiff.

Antonio Anaya, Special Asst. Dist. Atty. (James C. Thompson, Dist. Atty., Santa Fe County), for Board of Commissioners of Santa Fe County.

Charles D. Olmsted, Santa Fe, N. M., for defendant Sangre De Cristo Development Co., Inc.

Richard J. Smith, Asst. U. S. Atty. (Victor R. Ortega, U. S. Atty.), Albuquerque, N. M., Anthony S. Borwick, Atty., Dept. of Justice, Washington, D. C., for the federal defendants.

Jefferson R. Rhodes, Fettinger & Burroughs, Alamogordo, N. M., for the Mescalero Apache Tribe.

MEMORANDUM OPINION

BRATTON, District Judge.

This action presents for decision the question of what authority a state may exert over non-Indians who have entered into a 99 year lease with an Indian tribe under which the non-Indians propose to develop the leased land as a subdivision of homes, together with appropriate commercial and recreational facilities.

The lease involved in this controversy was entered into in 1970 between the defendant Sangre de Cristo Development Company and the Pueblo of Tesuque and was approved by the Secretary of the Interior as provided by 25 U.S.C.A. § 415(a) and 25 C.F.R. § 131. The lease covers pueblo land situated in Santa Fe County within five miles from the boundary of the city of Santa Fe, and the subdivision begun on the land is called Colonias de Santa Fe.

The Pueblo of Tesuque has a membership of approximately 350, of whom nearly 300 live at the pueblo. The leased land lies approximately two miles from the pueblo where the members live and is further separated from the pueblo and the non-leased lands by a major highway. A city of several thousand non-Indian residents, together with a golf course, motel, and other commercial developments, is planned for the leased land.

In negotiating the lease, the lessor, lessee, and participating federal authorities proceeded from the premise that the state of New Mexico should not and would not have jurisdiction over a development of the kind contemplated because of its location on Indian land. This was anticipated in part because of the disclaimer in the state's enabling act and its constitution,[1] which was never amended to allow the state to assume the criminal and civil jurisdiction offered states under Public Law 280.[2] Since the time of the enactment of Public Law 280, there had been imposed upon the assumption of such jurisdiction the further requirement that consent to it be given by the affected Indians by a majority of the adult Indians voting at a special election held for that purpose pursuant to the provisions of 25 U.S.C.A. §§ 1321–1326.[3] In the absence of

---

1. Joint Resolution of Congress, June 20, 1910, No. 8, 36 Stat. 557, and Article XXI, Sec. 2 of the New Mexico Constitution state:

"The people inhabiting this state do agree and declare that they forever disclaim all right and title to the unappropriated and ungranted public lands lying within the boundaries thereof, and to all lands lying within said boundaries owned or held by any Indian or Indian tribes, the right or title to which shall have been acquired through the United States, or any prior sovereignty, and that until the title of such Indian or Indian tribes shall have been extinguished the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States."

2. 18 U.S.C.A. § 1162; 28 U.S.C.A. § 1360 note:

Consent of United States to Other States to Assume Jurisdiction. Section 7 of Act August 15, 1953 provided that:

"The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act [adding section 1360 of this title and section 1162 of Title 18] to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof."

Amendment of State Constitutions to Remove Legal Impediment; effective Date. Section 6 of Act Aug. 15, 1953, provided that: "Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act [adding section 1360 of this title and section 1162 of Title 18]: Provided, That the provisions of this Act shall not become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes as the case may be."

3. Kennerly v. District Court of Montana, 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971).

this state and Indian action, it was thought that supreme and exclusive authority and control should repose in Congress.

Those involved in the lease negotiations also thought that the federal policy of encouraging non-Indians to invest in and develop business ventures in Indian country to the end that the economic conditions of Indians in Indian country will be improved, as expressed in 25 U. S.C.A. § 415(a) and 25 C.F.R. § 131, pre-empted the field, so that no room was left for the assertion of state jurisdiction.

Finally, it was thought that the fact that the land itself was tax-exempt would inure to the benefit of the lessees, so that their leasehold interest would be tax-exempt and their activities on the land would not be subject to other state taxes.

This is not to say that the lease negotiators were unaware of the state's disagreement with their position. A field solicitor of the Department of Interior who was involved in the negotiations testified that they knew that the state asserted it had jurisdiction over such a leasehold interest. The government attorney was not certain which sovereign was the proper one to charter a government for the development and, pending that determination by Congress or the courts, a selection was made of the pueblo. However, it was anticipated that the role of the tribe would be that of a landlord and that the developer and the residents of the subdivision would provide the needed governmental services and that no such services would be provided by the pueblo.

Once the lease had been finalized, the state of New Mexico moved rapidly to assert its jurisdiction and control over the development. In a series of exchanges, state officials notified the company that the state considered its laws controlling, and the company responded that the state had no jurisdiction over

activities upon land leased from the Pueblo of Tesuque and lacked jurisdiction to impose and collect any tax.

The company brought suit in state court, seeking to enjoin the City of Santa Fe and the Board of County Commissioners of Santa Fe County from exercising platting and planning authority and subdivision control conferred upon them by N.M.Stat.Ann. §§ 14–18–1 through 14–20–24 (1953) (Repl.1968) and N.M.Stat.Ann. §§ 70–3–1—70–3–9 (1953) (Supp.1971). On appeal, the New Mexico Supreme Court held that the United States had pre-empted or reserved all control over the subdivision, planning and platting of leased Indian lands, so that there was no room for the state or its political subdivisions to impose additional or conflicting controls.[4] In so deciding, the court relied upon 25 U.S.C.A. § 415(a) and the regulations promulgated by the Secretary of the Interior at 25 C.F.R. §§ 1.4, 131.

The state then filed the present action. It claims that the company has refused to comply with applicable state laws as follows:

(1) The company has refused to obtain a dispenser's license pursuant to N. M.Stat.Ann. §§ 46–5–1, 46–5–2 (1953), before offering for sale liquor at a motel it plans to build on the subdivision;

(2) The company has refused to comply with the Construction Industries Licensing Act, N.M.Stat.Ann. §§ 67–35–1 et seq. (1953) (Supp.1973), including the Act's standards relating to all phases of building and to permits, and, to date, has built a sales office at the subdivision without such compliance;

(3) The company has refused to submit to the platting and planning authority of the county under the Land Subdivision Act, N.M.Stat.Ann. §§ 70–3–1 et seq. (1953) (Supp.1971), and has offered for sale and has sold subleases without having the county commission's prior approval of the plat of the subdivided land;

4. Sangre de Cristo Dev. Corp., Inc. v. City of Santa Fe, 84 N.M. 343, 503 P.2d 323 (1972), cert. denied, 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 400 (1973).

(4) The company has stated it is not bound by the state's Water Quality Act, N.M.Stat.Ann. §§ 75–39–1 et seq. (1953), nor by N.M.Stat.Ann. § 12–1–4(8) (1953), governing water supplies and sewage disposal;

(5) The company has refused to pay an ad valorem tax on its leasehold interest and to declare and pay such a tax on its on-site sales office as required by N.M. Stat.Ann. § 72–1–1 (1953); and

(6) The company has refused to pay a gross receipts tax pursuant to N.M. Stat.Ann. §§ 72–16A–1 et seq. (1953) (Supp.1973), on receipts derived from the sale of soft drinks at its sales office.

The state also asserted that its false advertising statutes, N.M.Stat.Ann. §§ 49–12–1 et seq. (1953), are applicable. The company has conceded that the statutes do apply to its advertising, all of which is conducted off the reservation, so this is no longer an issue in the case.

It is the state's contention that the above statutes extend to the defendant company and its activities by virtue of the company's non-Indian status and by virtue of the state's police power.

The state has joined the Secretary of the Interior, the Commissioner of Indian Affairs, and the Area Supervisor of the Albuquerque Area office of the Bureau of Indian Affairs as defendants in this action, claiming that they, in reliance on 25 C.F.R. § 1.4, authorized Sangre de Cristo Development Company to develop and use the leased lands without regard to and in violation of the laws of New Mexico when they approved the lease agreement and subdivision plats and a master plan for the land. The federal activities, the state contends, were unlawful or *ultra vires* of the federal defendants' lawful authority. Thus, the state directly challenges the validity of 25 C.F.R. § 1.4.[5] In the state action, there was no challenge to the validity of the regulation. Neither the state nor the Secretary of Interior were parties to that action. There being no challenge to the validity of the regulation, the state supreme court correctly interpreted it as a complete preemption of the field.[6] In the present action, the Secretary is a party and its validity has been challenged, so that this issue must now be considered.

While the federal defendants initially denied reliance upon the challenged regulation, it is admitted that they knew of it at the time of the lease negotiations and believed that it reflected the existing law covering the Secretary's authority with regard to the application of state law to leases of Indian land, a position in which they are supported by the defendant company and the amici curiae.

In essence the state of New Mexico's position is that, while the lease is between Indians and non-Indians and in-

---

5. 25 C.F.R. § 1.4 provides:

State and local regulation of the use of Indian property.

(a) Except as provided in paragraph (b) of this section, none of the laws, ordinances, codes, resolutions, rules or other regulations of any State or political subdivision thereof limiting, zoning or otherwise governing, regulating, or controlling the use or development of any real or personal property, including water rights, shall be applicable to any such property leased from or held or used under agreement with and belonging to any Indian or Indian tribe, bank, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States.

(b) The secretary of the Interior or his authorized representative may in specific cases or in specific geographic areas adopt or make applicable to Indian lands all or any part of such laws, ordinances, codes, resolutions, rules or other regulations referred to in paragraph (a) of this section as he shall determine to be in the best interest of the Indian owner or owners in achieving the highest and best use of such property. In determining whether, or to what extent, such laws, ordinances, codes, resolutions, rules or other regulations shall be adopted or made applicable, the Secretary or his authorized representative may consult with the Indian owner or owners and may consider the use of, and restrictions or limitations on the use of, other property in the vicinity, and such other factors as he shall deem appropriate.

6. Sangre de Cristo Dev. Corp., Inc. v. City of Sante Fe, note 4 *supra.*

volves Indian land, the involvement of non-Indians is to such a degree that state jurisdiction is called into play, and thus, the present case is an exception to the general rule that authority over Indian affairs rests with the federal government to the exclusion of state government.[7] It is claimed that where, as here, the activities sought to be reached by the state are non-Indian activities, the state has jurisdiction unless limited by federal enactment.[8] Hence, the state seeks to prove that, without regard to Public Law 280 and under the rule that its constitutional disclaimer is only one of proprietary interest and not governmental interest,[9] it can assert governmental authority over the lands in question. In so doing, it contends, it will in no way interfere with tribal self-government or impair a right granted or reserved by federal law, the guidelines under which its position must be tested.[10] The state believes that the status of the tribe in the present matter is that of a landlord and its only real interest in the lease arrangement is financial gain. The state's position is supported by the intervening plaintiffs, the City of Santa Fe and the Board of Commissioners of Santa Fe County.

■ Before turning to the resolution of whether the specific state statutes involved herein apply to the defendant company, it should be observed that, without regard to Public Law 280, there are circumstances under which state laws have application on Indian land. Thus, for example, a murder of a non-Indian by a non-Indian on an Indian reservation has been held, in the absence of express federal legislation to the contrary, to be a matter under state jurisdiction.[11] State tax laws have been held applicable to non-Indians undertaking activity on Indian reservations.[12] Lessees of mineral rights in Indian lands have been held not to be immune from state gross production taxes and state excise taxes on petroleum produced from such lands.[13] Under certain circumstances, a state has been able to tax the transfer of certain restricted property of an Indian,[14] as well as certain tribal business activities.[15] Further, the state courts have had jurisdiction over actions by Indians against non-Indians.[16]

■■ Thus is exposed the error in the assumption that exclusive authority over Indian lands and all uses of and activities thereon is, in the absence of a specific delegation of such authority to the state, vested in the Congress. The states have, on the contrary, had certain authority in the absence of specific preemption of that authority by Congress. The passage of Public Law 280 was not intended to and did not oust existing state jurisdiction.

■ There is no question that Congress has plenary powers over all Indian affairs and can, if it so desires, preclude

---

7. U. S. Dep't. of the Interior, Federal Indian Law 504–05 (1958).

8. *Id.* at 513–14.

9. Organized Village of Kake v. Egan, 369 U. S. 60, 68–69, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962) ; Sangre de Cristo Dev. Corp., Inc. v. City of Santa Fe, note 4, *supra*.

10. Mescalero Apache Tribe v. Jones, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973) ; Organized Village of Kake v. Egan, note 9, *supra* at 75 of 369 U.S., 82 S.Ct. 562 ; Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959) ; New York ex rel. Ray v. Martin, 326 U.S. 496, 66 S.Ct. 307, 90 L. Ed. 261 (1946) ; Draper v. United States, 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419 (1896).

11. New York ex rel. Ray v. Martin, note 10, *supra*; Draper v. United States, note 10, *supra*; United States v. McBratney, 104 U.S. 621, 26 L.Ed. 869 (1881).

12. Thomas v. Gay, 169 U.S. 264, 18 S.Ct. 340, 42 L.Ed. 740 (1898) ; Utah and Northern R. Co. v. Fisher, 116 U.S. 28, 6 S.Ct. 246, 29 L.Ed. 542 (1898).

13. Oklahoma Tax Comm'n v. Texas Co., 336 U.S. 342, 69 S.Ct. 561, 93 L.Ed. 721 (1949).

14. Oklahoma Tax Comm'n v. United States, 319 U.S. 598, 63 S.Ct. 1284, 87 L.Ed. 1612 (1943).

15. Mescalero Apache Tribe v. Jones, note 10, *supra*.

16. United States v. Candelaria, 271 U.S. 432, 46 S.Ct. 561, 70 L.Ed. 1023 (1926).

state jurisdiction. Where federal statutes and regulations issued pursuant thereto entirely comprehend a subject, there can remain no room for state laws imposing additional burdens on that subject.[17] In the absence of governing acts of Congress, the resolution of whether a given state action is permitted depends on whether it infringes upon the right of the Indians to make their own laws and be ruled by them.[18]

The efficacy of the state's assertion of authority over the defendant Sangre de Cristo Company must be determined by these tests.

The first specific state statute to be considered is the liquor licensing act. The state has asserted that the company must obtain a dispenser's license pursuant to Section 46-5-2 of the act. The federal defendants agree that the act is applicable, for it would be enforced against non-Indians.

The company argues that the state liquor laws are not controlling but are merely the standard to be used to define lawful and unlawful activity under 18 U.S.C.A. § 1161.[19]

The introduction of liquor into Indian country was originally prohibited,[20] but in 1953 Congress changed this law to permit the sale of liquor in Indian country if the transaction was in conformity with state law and was authorized by an ordinance adopted by the affected tribe. The Tesuque tribe adopted an ordinance in December of 1970, permitting the sale of liquor on the tract of land it had leased to the Sangre de Cristo developers.

■ Whether the application of this liquor law interferes with tribal self-government is easy of disposition. Requiring non-Indians to comply with state law in this regard cannot interfere with it, for the state action here does not touch the tribe or any of its members governmentally or individually.

■ The essential question is whether 18 U.S.C.A. § 1161 was intended by Congress to delegate to the Tesuque Tribe the authority to supervise and regulate all liquor businesses on its land, including those conducted by non-Indians, or whether it gives the tribe, under the present circumstances, the right to decide, in the first instance, whether liquor will be permitted to be sold on tribal land by its lessees. The first interpretation is not reasonable and must be rejected.[21] The statute cannot be read to preempt state authority in this sphere. The state has in this instance a legitimate governmental function to perform, and non-Indians cannot avail themselves of any Indian immunity that exists to escape compliance.

It is in connection with its desire to impose its land subdivision, construction licensing, and water acts that the state has launched its attack on 25 C.F.R. § 1.4. Characterizing the regulation as an "undisguised power grab," the state claims that it is not authorized by any act of Congress,[22] and that the Secretary has used it, in the present leasing agreement, to oust legitimate state control and regulation of non-Indian activities. The state asserts that the regulation is inconsistent with the articulated tests

17. Warren Trading Post Co. v. Arizona Tax Comm'n, 380 U.S. 685, 85 S.Ct. 1242, 14 L. Ed.2d 165 (1965).

18. Williams v. Lee, note 10, *supra*.

19. 18 U.S.C.A. § 1161, provides:
   The provisions of sections, 1154, 1156, 3113, 3488, and 3618, of this title, shall not apply within any area that is not Indian country, nor to any act or transaction within any area of Indian country provided such act or transaction is in conformity both with the laws of the State in which such act or

transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country, certified by the Secretary of the Interior, and published in the Federal Register.

20. 18 U.S.C.A. § 1154.

21. Cf. United States v. Mazurie, 487 F.2d 14 (10th Cir. 1973).

22. Price, Law and the American Indian, 290-93 (1973), lends support to the state's claim that the Regulation is broader than the Secretary's scope of authority.

for the applicability of state laws on Indian land found in Supreme Court decisions.[23]

The Secretary's notice of the proposed regulation indicates that it was his belief that it enunciated the sense of existing law under which state laws are inapplicable to Indian trust property held or used under a lease.[24] His rule-making power, derived from 25 U.S.C.A. § 2, confers only the authority to implement specific laws.[25] In the present case, the United States initially took the position that the regulation stood only for the proposition that nothing in Public Law 280 authorizes the operation of state law on title to Indian land, i. e., that it restates the effect of the language in 28 U.S.C.A. § 1360(b) explicitly barring the application of state law if such application would result in the alienation, encumbrance, or taxation of Indian land or otherwise affect the Indians' ownership rights. At first the federal defendants claimed that the regulation was not relevant here, since this action contains no Public Law 280 issue. At trial, it was conceded that the regulation did apply in non-Public Law 280 states.

No law of the state of New Mexico or ordinance of a political subdivision thereof has been made applicable to the Tesuque lease by the Secretary pursuant to the regulation.

It should be noted that Section 1.4 has been held void insofar as it purports to enlarge or restrict the scope of jurisdiction afforded by Public Law 280.[26]

In this action, the federal defendants assert their actions regarding the lease are authorized by 25 U.S.C.A. § 415(a).[27] The final sentence of Section 415(a) was added in 1970 after the Sangre de Cristo lease was approved, but the federal defendants take the position that it indicates prior congressional policy that federal, not state, authorities have the power to determine quality of construction on Indian leases. They also assert that the application of the state's water laws would conflict with the Secretary's authority under Section 415(a) as amended, to review the environmental effects of a development and could, by a stoppage of development under the state law, be inconsistent with his authority to approve a lease once he is satisfied with the environmental effect of a development. In connection with the state water laws, the federal defendants point out that the federal water quality act, 33 U.S.C.A. §§ 1151 et seq., adopts state water quality standards for the abatement of pollution in interstate waters, but they contend that the act is not a grant of jurisdiction to the state to enforce water pollution laws on reservation land.

As for the land subdivision act, it is suggested that Section 70–3–2 exempts

23. Organized Village of Kake v. Egan, note 9 *supra*; Williams v. Lee, note 10 *supra*; Warren Trading Post Co. v. Arizona Tax Comm'n, note 17 *supra*.

24. 30 Fed.Reg. 6438 (May 8, 1965).

25. Organized Village of Kake v. Egan, note 9 *supra* at 63 of 369 U.S., 82 S.Ct. 562.

26. Rincon Band of Mission Indians v. County of San Diego, 324 F.Supp. 371 (S.D.Cal. 1971) (now pending on appeal).

27. Any restricted Indian lands, whether tribally, or individually owned, may be leased by the Indian owners, with the approval of the Secretary of the Interior, for public, religious, educational, recreational, residential, or business purposes, including the development or utilization of natural resources in connection with operations under such leases * * * * All leases so granted shall be for

a term of not to exceed twenty-five years, except leases of [the pueblo of Tesuque] * * * * [A]ll leases and renewals shall be made under such terms and regulations as may be prescribed by the Secretary of the Interior. Prior to approval of any lease or extension of an existing lease pursuant to this section, the Secretary of the Interior shall first satisfy himself that adequate consideration has been given to the relationship between the use of the leased lands and the use of neighboring lands; the height, quality, and safety of any structures or other facilities to be constructed on such lands; the availability of police and fire protection and other services; the availability of judicial forums for all criminal and civil causes arising on the leased lands; and the effect on the environment of the uses to which the leased lands will be subject.

subdivisions approved by an agency of the United States, so that it is inapplicable to the development. This argument was persuasive in the state trial court [28] but was not found to be persuasive on appeal to the state supreme court.[29]

As indicated above, the lease agreement covered the kinds of things the state here seeks to control. The Secretary approved the master subdivision plan submitted by the company, as well as a subdivision plat for a portion of the land. The lease put upon the company the burden of establishing a committee, to be approved by the Secretary, to review and approve all construction plans, to provide all utility services, and to comply with all applicable air and water pollution control laws and the recommendations of the appropriate federal agency in the construction and maintenance of all facilities on the leased premises.

Over a year after this lawsuit was filed and long after the lessee had begun selling subleases, Tesuque Pueblo adopted subdivision regulations for the development, taken from the subdivision regulations of the City of Santa Fe. The pueblo had in 1969 adopted certain building, electrical and plumbing codes for the pueblo, which the lease drafters anticipated would apply to the subdivision.

The upshot of all of this is that the developer would initially protect the interests of those to whom it subleases and of those adjacent to or in any way affected by activities on the leased land by complying with both the regulations adopted by the pueblo and the provisions of the lease.

■ If the state laws concerning subdivision control, construction licensing, and water here sought to be imposed are tested against the rule that such state laws may not be imposed if they infringe upon the Indians' right to make

their own rules and be governed by them, it is difficult to see why such laws should not be applied. The application of the laws in question to the lessee only remotely, if at all, affects the Tesuque Indians. The state is merely trying to exert its legitimate police power to protect its citizens.

The land subdivision act is essentially a consumer protection statute, the aim of which is to provide full disclosure by a lessee to potential sublessees of such things, for example, as the existence of streets and roads, full financing terms, and the availability of water and public utilities. It also requires advance approval of the plat by a political subdivision of the state. The act in this case operates solely upon the activities of the company and serves to protect non-Indian people in New Mexico from any threat of a fraudulent subdivision scheme.

The suggestion that the act itself exempts this subdivision cannot be accepted. The state supreme court in construing the act found that the state's political subdivision had this authority but that the Colonias development was exempt because of federal preemption.[30]

The same kind of reasoning applies with equal force to the construction licensing act. The stated purpose of the act, as found in Section 67–35–4, is to promote the general welfare of the people of New Mexico by, among other things, protecting them from substandard construction and any fiscal irresponsibility of persons engaged in construction. The persons sought to be protected are not Indians, and the act would not be applied in this case to Indian activity. .

The above is equally true with regard to the water acts the state seeks to apply to the subdivision. The state is authorized to protect the water supply and, by

28. Sangre de Cristo Dev. Co., Inc. v. City of Santa Fe, No. 43–218 (D.N.M., Sept. 28, 1971).

29. Sangre de Cristo Dev. Corp., Inc. v. City of Santa Fe, note 4 *supra*.

30. Sangre de Cristo Dev. Corp., Inc. v. City of Santa Fe, note 4 *supra*.

doing so, the health of the people who will be residing in the subdivision, and this is true without regard to the federal water quality act.

Even though none of these state laws interfere with tribal self-government, there remains the vital question of whether they may not be applied because of federal preemption under 25 U.S.C.A. § 415(a) and 25 C.F.R. § 1.4.

Section 415(a), as it stood at the time the present agreement was entered into, provided that "all leases * * * shall be made under such terms and regulations as may be prescribed by the Secretary of the Interior." Pursuant to the section, the Secretary had promulgated regulations covering, for example, the mechanics of leasing, rentals, and duration of lease agreements.[31]

The state does not claim that these regulations were unauthorized by 25 U.S.C.A. § 415(a). In fact, it claims that only such regulations were authorized, i. e., regulations designed to fulfill the Secretary's fiduciary obligation to insure the welfare of the Indian lessors by fixing advantageous terms to the Indians in all their leases and by subjecting such leases to general regulations that would protect Indian interests.

■ The state correctly argues that 25 U.S.C.A. § 415(a), as it stood at the time the lease was entered into, authorized only what is reflected by the provisions of 25 C.F.R. § 131, so that Section 415(a) cannot be thought to have vested in the Secretary authority to regulate such things as construction, water, and land subdivision.

■ There has been in this action no assertion that Regulation 1.4 was promulgated pursuant to 25 U.S.C.A. § 415(a), as it stood before amendment. It is the only remaining source to which to look for support for the claim that state laws regulating use and development of Indian land leased to non-Indians do not apply to such land. The regulation was promulgated in 1965 and purports to state the sense of existing law that such is the case, but it implements no specific law stating such is the case and is inconsistent with judicial decisions which hold that state law may be applied to Indian land in the absence of interference with tribal self-government or Congressional preemption.[32] To the extent that Regulation 1.4 would preclude application of the state laws discussed above, it must be viewed as unauthorized legislative action by the Secretary and, as such, beyond the scope of his lawful authority.

Accordingly, the state laws in question cannot be held inapplicable to the lessee in this case because of federal preemption.

The state has also relied on 25 U.S.C.A. § 231[33] to support its position that certain of its laws are applicable to the subdivision. While this view has been thought to be meritorious,[34] the validity of this position need not, in view of the preceding conclusion, be decided.

The final issue in the case is whether the state can impose the taxes it desires to impose on the lessee.

The state seeks to tax two interests of the lessee. First, it seeks to tax the full

---

31. 25 C.F.R. §§ 131.1–131.20.

32. Cases cited note 10 *supra*. It should be noted that there is authority contrary to this opinion and to the effect that, in the absence of an assumption of jurisdiction under Public Law 280 by a state, the state has no authority to exercise its police power. *See* Agua Caliente Band of Mission Indians' Tribal Council v. City of Palm Springs, 347 F.Supp. 42, 51–52 (C.D.Cal.1972).

33. 25 U.S.C.A. § 231 provides:
The Secretary of the Interior, under such rules and regulations as he may prescribe,

shall permit the agents and employees of any state to enter upon Indian tribal lands, reservations, or allotments therein (1) for the purpose of making inspection of health and educational conditions and enforcing sanitation and quarantine regulations.

34. Snohomish County v. Seattle Disposal Co., 70 Wash.2d 668, 425 P.2d 22 (1967), cert. denied, 389 U.S. 1016, 1019–1020, 88 S.Ct. 585, 19 L.Ed.2d 662 (1967) (Douglas & White, JJ., dissenting, thought certiorari should have been granted to decide this issue).

value of the leasehold interest and improvement thereon. Second, it wants to impose upon certain sales a gross receipts tax.

Admittedly, the state cannot tax the land involved, but it claims there is no federal statute which prohibits taxation of the property interest of a lessee in a situation like the present. Further, the state asserts, and it has so been held, that the state's ad valorem tax provision is broad enough to encompass a lessee's interest in otherwise tax-exempt property.[35]

The gist of the state's contention is that, while the tax may not be levied directly against the Indian trust property, such immunity does not shield private parties with whom the Indians do business simply because it indirectly affects the Indians by making the land they wish to lease to such private parties worth less rental value to them.

■■■ A nondiscriminatory state tax levied upon the defendant company, organized as it is for profit and only incidentally performing a federal function by leasing from Indians, is proper.[36] The company does not become a federal instrumentality by virtue of the lease. Nor does such a tax do violence to the governmental powers of the pueblo.

There is, further, no federal statute which forbids the imposition of this state tax upon the leasehold interest, and there can be no assumption that Congress intended to create an immunity for the lessees.

■■■ In the present action, whatever interest that is not part of the fee and can be taxed as separate from the fee interest of the Indians, is taxable by the state.[37] Any tax that purports to touch or create a lien on the land cannot be levied by the state, and the state has correctly so stipulated. Like the use tax that is permitted to be imposed on lessees from a tax-exempt lessor,[38] the tax here sought to be imposed may be levied on the defendant company's leasehold interest.

■■■ The gross receipts tax is also an allowable tax upon the lessee's business activity at the subdivision. If a tribal enterprise conducted upon tax-exempt land is subject to the state's gross receipts tax,[39] it must follow that a lessee's activity on tax-exempt Indian land is subject to the tax.

This decision is consistent with the principles of tribal consent and the necessity for a state to adopt Public Law 280 before it can assume broad civil and criminal jurisdiction over Indian people contemplated by Public Law 280. That event still awaits the amendment of the state constitution and a vote of the tribal members. All that is concluded here is that the state has the jurisdiction set forth above over the Sangre de Cristo Development Company and its activities at its Colonias de Santa Fe subdivision.

This Memorandum Opinion containing the Court's findings of fact and conclusions of law will be filed herein, together with judgment in favor of the plaintiffs.

## JUDGMENT

This action having come on for hearing, and the Court having filed herein

---

35. Kirtland Heights v. Board of County Comm'rs, 64 N.M. 179, 326 P.2d 672 (1958).

36. United States v. City of Detroit, 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958); Federal Indian Law, note 7 *supra* at 852–53.

37. Oklahoma Tax Comm'n v. Texas Co., note 13 *supra*; Agua Caliente Bank of Mission Indians v. County of Riverside, 442 F.2d 1184 (9 Cir. 1971), cert. denied, 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 809 (1972), reh. denied 405 U.S. 1033, 92 S.Ct. 1280, 31 L.Ed.2d 491 (1972); reh. denied 409 U.S. 901, 93 S.Ct. 94, 34 L.Ed.2d 163 (1972). *See also* Thomas v. Gay and Utah and Northern R. Co. v. Fisher, note 12 *supra*. *See* Mescalero Apache Tribe v. Jones, note 10 *supra* at 162–163 of 411 U.S., 93 S.Ct. 1267 (Douglas, J., dissenting).

38. United States v. City of Detroit, note 36 *supra*; Agua Caliente Band of Mission Indians v. County of Riverside, note 37 *supra*.

39. Mescalero Apache Tribe v. Jones, note 10 *supra*.

its Memorandum Opinion finding the issues in favor of 'the plaintiff and against the defendants; Now, Therefore,

It is adjudged and decreed that the following statutes are applicable to the defendant Sangre de Cristo Development Company, Incorporated, in its operation and activities at the Colonias de Santa Fe Subdivision under the lease dated May 24, 1970:

(1) N.M.Stat.Ann. §§ 46–5–1 and 46–5–2 (1953);

(2) N.M.Stat.Ann. §§ 67–35–1 et seq. (1953) (Supp.1973);

(3) N.M.Stat.Ann. §§ 72–1–1 (1953);

(4) N.M.Stat.Ann. §§ 70–3–1 through 70–3–9 (1953) (Supp.1973);

(5) N.M.Stat.Ann. §§ 12–1–4(8) and 75–39–1 through 75–39–12 (1953);

(6) N.M.Stat.Ann. §§ 72–16A–1 et seq. (1953) (Supp.1973).

It is further adjudged and decreed that 25 C.F.R. § 1.4 is not a valid and enforceable regulation of the Secretary of the Interior in respect to the Colonias de Santa Fe Subdivision.